RECORD NO. 13-2449

## IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

FLEXIBLE FOAM PRODUCTS, INCORPORATED,

*Plaintiff-Appellant,*

v.

VITAFOAM INCORPORATED and
BRITISH VITA UNLIMITED,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
HON. MARTIN REIDINGER, DISTRICT JUDGE

**RESPONSE BRIEF OF DEFENDANTS-APPELLEES**

A. Ward McKeithen
Everett J. Bowman
Lawrence C. Moore, III
ROBINSON BRADSHAW & HINSON, PA
101 North Tryon Street, Suite 1900
Charlotte, NC 28246
(704) 377-2536

*Counsel for Defendants-Appellees*
*Vitafoam Incorporated and British Vita Unlimited*

## STATEMENT REGARDING ORAL ARGUMENT

Vitafoam believes that the district court's opinion and briefs are sufficient, and that oral argument is unnecessary. Accordingly, Vitafoam does not request oral argument.

# CORPORATE DISCLOSURE STATEMENT

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-2449__    Caption: Flexible Foam Products, Inc. v. Vitafoam Incorporated, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

British Vita Unlimited
(name of party/amicus)

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☑ YES ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
      British Vita (UK) Limited, British Vita (LuxIII) Sarl, and Vita Cayman II Limited are the parent, grandparent, and great-grandparent corporations, respectively, of British Vita Unlimited.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

10/28/2013 SCC                    - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ A. Ward McKeithen (NC Bar # 5063)        Date: 12/5/2013

Counsel for: British Vita Unlimited

## CERTIFICATE OF SERVICE
****************************

I certify that on ___12/5/2013___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Frederick S. Barbour
Cloninger Barbour Searson & Jones, PLLC
21 Battery Park Avenue, Suite 201
Asheville, NC 28801-0000

Michael Don Mustard
Barnes & Thornburg LLP
110 East Wayne Street
Fort Wayne, IN 46802

Bradley Robert Love
Michael Rosiello
Kendall Millard
Barnes & Thornburg LLP
11 North Meridian Street
Indianapolis, IN 46260

/s/ A. Ward McKeithen (NC Bar # 5063)                    12/5/2013
            (signature)                                    (date)

- 2 -

iii

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-2449__        Caption: Flexible Foam Products, Inc. v. Vitafoam Incorporated, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Vitafoam Incorporated
(name of party/amicus)

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                    ☑ YES ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
      Vita Investments North America Limited, Vita International Limited, and British Vita Unlimited are the parent, grandparent, and great-grandparent corporations, respectively, of Vitafoam Incorporated.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                              ☐ YES ☑ NO
      If yes, identify all such owners:

10/28/2013 SCC                        - 1 -

iv

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation (Local Rule 26.1(b))?     ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: _/s/ A. Ward McKeithen (NC Bar # 5063)_      Date: _____12/5/2013_____

Counsel for: _Vitafoam Incorporated_____

## CERTIFICATE OF SERVICE
****************************

I certify that on _____12/5/2013_____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Frederick S. Barbour
Cloninger Barbour Searson & Jones, PLLC
21 Battery Park Avenue, Suite 201
Asheville, NC 28801-0000

Michael Don Mustard
Barnes & Thornburg LLP
110 East Wayne Street
Fort Wayne, IN 46802

Bradley Robert Love
Michael Rosiello
Kendall Millard
Barnes & Thornburg LLP
11 North Meridian Street
Indianapolis, IN 46260

_/s/ A. Ward McKeithen (NC Bar # 5063)_          _____12/5/2013_____
(signature)                                          (date)

- 2 -

v

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

CORPORATE DISCLOSURE STATEMENT ..................................................... ii

TABLE OF AUTHORITIES ........................................................................... viii

I.   STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..................1

    1.   Whether the district court erred in concluding that, under the parties' November 28, 2005 Asset Purchase Agreements (the "Agreements"), Vitafoam Incorporated did not convey its *Urethane* antitrust claim to Flexible Foam Products, Inc. ("FFP") .............................................................................................1

    2.   Whether the district court granted summary judgment on grounds not raised by a party ..............................................................1

    3.   Whether the district court erred in concluding that FFP's unjust enrichment and conversion claims failed as a matter of law ...............1

    4.   Whether the district court erred in concluding that FFP's claims are barred by the statute of limitations ...................................................1

II.  STATEMENT OF THE CASE .....................................................................1

III. SUMMARY OF ARGUMENT .....................................................................6

IV.  ARGUMENT .................................................................................................8

    A.   The district court correctly ruled that the Agreements did not transfer any portion of Vitafoam's *Urethane* antitrust claim to FFP ..............................................................................................................8

    B.   The district court did not rely on any grounds not raised by the parties ..............................................................................................18

    C.   FFP's conversion claim is totally dependent upon and derivative of its contract claim, and fails as a matter of law..............21

    D.   FFP's claims are barred by the statute of limitations........................22

        1.   FFP's claims accrued more than three years prior to the filing of this action ................................................................22

        2.   The continuing wrong doctrine does not apply .......................30

V.   CONCLUSION.............................................................................................34

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF SERVICE ..................................................................35

CERTIFICATE OF COMPLIANCE.......................................................36

# TABLE OF AUTHORITIES

## Cases

*Babb v. Graham,* 190 N.C. App. 463, 660 S.E.2d 626 (2008) ...............................30

*Birtha v. Stonemor, North Carolina*, *LLC*, 727 S.E.2d 1 (N.C. Ct. App. 2012), *rev. denied*, 366 N.C. 570, 738 S.E.2d 373 (2013)...................................30

*Blythe v. Bell*, 11 CVS 933, 2013 WL 440701 (N.C. Super. Feb. 4, 2013) ...........32

*Dean v. Mattox,* 250 N.C. 246, 108 S.E.2d 541 (1959)...........................................23

*Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002)......................................11

*Dixon v. Kinser*, 54 N.C.App. 94, 282 S.E.2d 529 (1981) ......................................29

*Eubank v. Van-Riel*, 727 S.E.2d 25 (N.C. Ct. App. 2012).......................................30

*Faulkenbury v. Teachers' & State Employees' Ret. Sys.,* 108 N.C. App. 357, 424 S.E.2d 420 (1993), *rev. denied*, 334 N.C 162, 432 S.E.2d 358 (1993)......................................................................................................................31

*Haley Paint Co. v. E.I. Dupont De Nemours & Co.*, 804 F. Supp. 2d 419 (D. Md. 2011) ........................................................................................................11

*Hardin v. York Mem'l Park*, 730 S.E.2d 768 (N.C. Ct. App. June 19, 2012), *rev. denied*, 366 N.C. 571, 738 S.E.2d 376 (2013)...................................28

*Housecalls Home Health Care, Inc. v. State Dep't of Health and Human Servs.,* 200 N.C. App. 66, 682 S.E.2d 741 (2009) ................................................23

*In re Edmundson,* 273 N.C. 92, 159 S.E.2d 509 (1968).........................................18

*JNV Aviation, L.L.C. v. Flight Options, L.L.C.*, 495 Fed. App'x. 525 (5th Cir. 2012)..............................................................................................................19

*Lattimore v. Fisher's Food Shoppe, Inc.*, 313 N.C. 467, 329 S.E.2d 346 (1985)......................................................................................................................17

*Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 924 F.2d 539 (4th Cir. 1991)......................................................................................................................14

*Liberty Mut. Ins. Co. v. Pella Corp.*, 650 F.3d 1161 (8th Cir. 2011) .....................21

*Liptrap v. City of High Point*, 128 N.C. App. 353, 496 S.E.2d 817 (1998) ...........31

*Loren Data Corp. v. GXS, Inc.*, 501 Fed. App'x 275 (4th Cir. 2012) ...................11

*Marzec v. Nye*, 203 N.C. App. 88, 690 S.E.2d 537 (2010).....................................31

*MedCap Corp. v. Betsy Johnson Health Care*, 16 Fed. App'x 180 (4th Cir. 2001)..................................................................................................32

*Morton's Mkt., Inc. v. Gustafson's Diary, Inc.*, 198 F.3d 823 (11th Cir. 1999)..................................................................................................13

*Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 537 S.E.2d 248 (2000)..................................................................................21

*Novell, Inc. v. Microsoft Corp.*, 429 Fed. App'x 254 (4th Cir. 2011) ...................13

*Pearce v. N.C.  State Highway Patrol Voluntary Pledge Comm.*, 310 N.C. 445, 312 S.E.2d 421 (1984) ...............................................................28

*Phelps v. Herro,* 137 A.2d 159 (Md.1957)............................................................29

*Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C.*, 180 N.C. App. 257, 636 S.E.2d  835 (2006).......................................................23

*Smyth v. U.S.,* 302 U.S. 329 (1937) ......................................................................29

*Stratton v. Royal Bank of Canada*, 211 N.C. App. 78, 712 S.E.2d 221 (2011).................................................................................................. 28, 32

*THI of New Mexico at Valle Norte, LLC v. Harvey*, 527 Fed. App'x 665 (10th Cir. 2013) ...............................................................................21

*Thomas v. Ocean Tech., Inc.*, 2009 WL 1578538 (E.D.N.C. May 29, 2009)..................................................................................................29

*Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 723 S.E.2d 744 (2012) .......................................................22

**Statutes**

15 U.S.C. § 12(a) .............................................................................. 7, 14

15 U.S.C. § 15(a) .............................................................................. 7, 14

N.C. Gen. Stat. § 1–52(1), (4) (2007) ..................................................................23

x

# I.   STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.     Whether the district court erred in concluding that, under the parties' November 28, 2005 Asset Purchase Agreements (the "Agreements"), Vitafoam Incorporated did not convey its *Urethane* antitrust claim to Flexible Foam Products, Inc. ("FFP").

2.     Whether the district court granted summary judgment on grounds not raised by a party.

3.     Whether the district court erred in concluding that FFP's unjust enrichment and conversion claims failed as a matter of law.

4.     Whether the district court erred in concluding that FFP's claims are barred by the statute of limitations.

# II.   STATEMENT OF THE CASE

FFP has appealed from the decision of the district court granting summary judgment to Vitafoam Incorporated and British Vita Unlimited (collectively, "Vitafoam") on two independent grounds: first, that Vitafoam did not convey its *Urethane* antitrust claim to FFP under the Agreements (thus disposing of FFP's contract, unjust enrichment, and conversion claims), and second, that the statute of limitations bars all of FFP's claims in the action.  J.A. 828.  The parties had filed cross-motions for summary judgment, agreeing that there were no factual issues for trial, and that judgment could be entered as a matter of law.  J.A. 813.

The case is straightforward, arising out of Vitafoam's 2005 sale to FFP of "certain of the assets" of two of Vitafoam's polyurethane foam plants.  J.A. 383, 423.   The key contract question presented in the district court was whether

Vitafoam sold to FFP some portion of its *Urethane* price fixing antitrust claim against chemicals suppliers related to Vitafoam's purchases during 1999-2003 of chemicals used at Vitafoam's High Point and Tupelo urethane foam plants prior to the 2005 sale of these two plants to FFP. J.A. 119.

In 2005, both Vitafoam and FFP were engaged in the production of urethane foam. Vitafoam had three U.S. urethane plant locations: Greensboro, North Carolina, High Point, North Carolina, and Tupelo, Mississippi, and had a fourth plant in New Jersey that was part of Crest Foam, a joint venture with a Japanese company. J.A. 108, 262. FFP similarly had a number of U.S. urethane plants. J.A. 264.

Pursuant to the Agreements dated November 28, 2005, which are identical in all respects material to this litigation, Vitafoam agreed to sell, and FFP to purchase, certain listed assets described as "assets rights and properties then owned by Seller [Vitafoam] and used or held for use primarily in the Business ('Purchased Assets'), but specifically excluding the Excluded Assets." J.A. 384, 424. The sales closed as of December 30, 2005. J.A. 261. The Agreements define "Business" as "Seller's foam manufacturing and fabrication business conducted at the High Point Facility" or "at the Tupelo Facility," respectively. J.A. 383, 423. Thus, FFP purchased certain assets then used or held for use at the High Point and Tupelo urethane plants as of the end of 2005. The Agreements' list of the Purchased

2

Assets included item 2.1(g), "all of the intangible rights and properties of Seller used exclusively in the Business," and 2.1(h), "all claims of Seller against third parties related exclusively to the Business."    J.A. 384-85, 424-425.    The Agreements also described assets *not* included in the sale (the "Excluded Assets") in Section 2.2 (Excluded Assets), including 2.2(n), "all intangible rights not used exclusively in the Business." J.A. 385, 425.

In the Spring of 2006, several months after the December 30, 2005 closing, Vitafoam and FFP first learned of a class action filed against the chemical companies that had been supplying urethane chemicals to Vitafoam, FFP and other urethane foam producers.  The action alleged that the suppliers had been engaged in price fixing prior to 2005.  J.A. 264 ¶13, 499 ¶5.  In June 2006, both Vitafoam and FFP, along with certain other urethane foam suppliers, opted out of the class, retaining the Dickstein Shapiro law firm (the "Dickstein firm") to represent them in a direct action against the chemical suppliers for purchases made prior to 2005. J.A. 47-48, ¶1.  Vitafoam's opt-out notice of June 9, 2006 listed all four of its U.S. urethane facilities, including High Point and Tupelo.  J.A. 55.  FFP's opt-out notice, also dated June 9, 2006, lists "business addresses used by" FFP "in the ordinary course of their business, with respect to the purchases of products underlying this request for exclusion from the Settlement Class."  J.A. 59.  FFP listed neither the High Point nor Tupelo facilities.  *Id.*

In July 2007, the Dickstein firm negotiated a settlement on behalf of Vitafoam, FFP, and the other opt-out plaintiffs with Bayer AG, one of the chemicals suppliers. J.A. 48-49 ¶5. The settlement, dated July 24, 2007, resulted in payments that the Dickstein firm distributed to the opt-out plaintiffs, including both Vitafoam and FFP, on August 15, 2007. J.A. 48-49 ¶¶5-6. Vitafoam received $2,532,800 as its share of the Bayer opt-out settlement at that time, including $1,301,495 attributable to purchases by Vitafoam of chemicals used at the High Point and Tupelo plants. J.A. 49 ¶¶6-7. FFP likewise received its share of the settlement proceeds, which share did not include any amounts attributable to the High Point and Tupelo plants. J.A. 49 ¶7.

The Dickstein firm filed the initial *Urethane* complaint on behalf of the opt-out plaintiffs on October 17, 2008. J.A. 139. That complaint asserted a price fixing claim on behalf of Vitafoam and FFP and other urethane producers. J.A. 142 ¶2. The allocation of damages amongst the opt-out plaintiffs, including Vitafoam and FFP, was based on the work of experts retained by Dickstein, the Bates White firm, following Bates White's review of the defendants' sales data during the claims or damages period of 1999-2003. J.A. 50 ¶¶9-10. All damages attributable to urethane chemicals used at the High Point and Tupelo facilities were allocated to Vitafoam, and none to FFP. J.A. 50 ¶10.

4

In May 2012, the *Urethane* opt-out plaintiffs, including Vitafoam and FFP, settled with defendants Huntsman and BASF, and the Bayer settlement allocated to Vitafoam was supplemented by an additional amount of $1,228,272 (referred to as the Bayer true-up amount). J.A. 50-51 ¶12. Vitafoam was paid $142,765 for the Huntsman settlement, of which $84,084 was attributable to chemicals used at the High Point and Tupelo plants. *Id.* The Bates White allocated Vitafoam $4,456,569 for the BASF settlement, of which $2,624,784 was attributable to chemicals used at the High Point and Tupelo plants. *Id.* On May 4, 2012, more than six years after the December 30, 2005 purchase of the High Point and Tupelo plants, FFP for the first time asserted rights to that portion of the *Urethane* price fixing claim attributable to chemicals purchased by Vitafoam and used at the High Point and Tupelo plants during the 1999-2003 period. J.A. 5. Pursuant to FFP's demand, portions of these settlements allocated to Vitafoam that represented amounts attributable to chemicals used at the High Point and Tupelo plants are being held in escrow by the Dickstein firm. J.A. 50-51 ¶12.

FFP filed this action on May 22, 2012. J.A. 5. The parties entered into a stipulation of fact (the "Joint Stipulation"), J.A. 47-69, which is reproduced in the district court's opinion, J.A. 808-13. Pursuant to the cross motions for summary judgment, each party filed three briefs addressing at length the legal issues, including the contract and statute of limitations issues. As explained below, the

district court addressed the arguments and issues presented by the parties, including the language of the contractual provision FFP argues is governing. The court awarded summary judgment to Vitafoam on both contract and limitations grounds, and FFP appealed.

## III.   SUMMARY OF ARGUMENT

Under the 2005 Agreements, FFP purchased and acquired the "assets rights and properties then solely owned by Seller and used or held for use primarily in the [High Point and Tupelo] Business ("Purchased Assets")." The district court correctly ruled that those assets did not include Vitafoam's subsequently discovered *Urethane* antitrust claim, which related to purchases of urethane chemicals that Vitafoam made (for all its U.S. plants) and paid for long before the sale of specified High Point and Tupelo plant assets to FFP. Section 2.1(h) of the Agreements, upon which FFP relies, does not apply, because as the district court correctly ruled, Vitafoam's *Urethane* claim does not "relate exclusively" to the business of the High Point and Tupelo plants. Rather, the *Urethane* antitrust complaints, filed jointly by FFP, Vitafoam, *et al.*, establish conclusively that Vitafoam asserted only one price fixing claim, which sought damages on a companywide basis for all the urethane chemicals that Vitafoam purchased during the 1999-2003 time period, for which Vitafoam sustained all of the damages. Furthermore, the Clayton Act provisions on standing, 15 U.S.C. §§ 12(a) & 15(a),

6

provide that the claim belongs to Vitafoam, and not to any of its plants individually.

FFP incorrectly contends that the district court failed to address the relevant provision of the Agreements in its order, and granted summary judgment to Vitafoam on grounds not raised by the parties. In fact, the district court quoted the language of Section 2.1(h), upon which FFP relied, and explained why that language and section do not apply to Vitafoam's *Urethane* claim. Further, since both parties moved for summary judgment, with extensive briefing on whether Vitafoam breached the Agreements, and whether FFP had any right to Vitafoam's *Urethane* antitrust claim under the Agreements (the sole and determinative issues as to all of FFP's claims), the district court did not rule on grounds not raised by a party, and did not violate Rule 56(f).

Nor, as Vitafoam contented and the district court ruled, does FFP have a viable conversion claim. An essential element of any conversion claim is the claimant's right to the property that is the subject of the alleged conversion. Since FFP has no contractual right under the Agreements to any portion of Vitafoam's *Urethane* claim, its conversion claim fails.

Finally, as the district court so recognized and ruled, under North Carolina law, the statute of limitations for breach of contract, conversion, or unjust enrichment claims is three years. The statute of limitations begins to run when the

slightest invasion of a party's rights occurs, irrespective of the party's knowledge of the violation. If FFP had any cause of action, it would have accrued upon Vitafoam's failure to assign the price-fixing claim to FFP at the December 2005 closing of the assets purchase, or, failing that, upon Vitafoam's submission of its June 9, 2006 opt-out notice listing all of its urethane facilities, including High Point and Tupelo, or, at the latest, upon Vitafoam's receipt in August 2007 of that portion of the Bayer settlement proceeds attributable to the chemicals used at the High Point and Tupelo plants during the 1999-2003 period. By any measure, because FFP did not file this action until May 2012, it is time barred. Nor does the narrow continuing wrong exception apply. There was no ongoing relationship between the parties, and no continuing violation. The settlement payments all flow from the one alleged breach: Vitafoam's assertion of its price fixing antitrust claim for the chemicals it purchased during the 1999-2003 claims period, including the purchase of chemicals that ultimately were used at the High Point and Tupelo plants prior to the 2005 asset sale.

## IV.  ARGUMENT

**A.** ***The district court correctly ruled that the Agreements did not transfer any portion of Vitafoam's Urethane antitrust claim to FFP.***

As the Agreements' description of the transferred assets states, the purpose of the Agreements was to transfer the assets then "used or held for use primarily in

the" the High Point and Tupelo urethane plants (that is, those assets necessary to the operation of those plants), J.A. 384, 419, or in FFP's words, "the operating assets" of these two plants.  J.A. 499.  FFP now seeks something (a portion of Vitafoam's *Urethane* claim) that is not and was not an "operating asset" or an asset "then … used or held for use" in the High Point or Tupelo plants, but rather is a claim for damages sustained by Vitafoam arising out of company-wide chemicals purchases made and paid for by Vitafoam during the 1999-2003 period, long before the December 30, 2005 sale to FFP.  The chemicals for which Vitafoam paid an inflated price were no longer in inventory at the time of the asset sale; Vitafoam suffered all of the associated damages.  J.A. 119.

Specifically, FFP contends that the portion of Vitafoam's price fixing claim attributable to the chemicals used at the High Point and Tupelo plants represents a "claim of Seller [Vitafoam] against third parties" related exclusively to the Business of the plants, under Section 2.1(h) of the Agreements, and thus was transferred to FFP.  FFP Brief at 15.[1]

The district court began its analysis by noting—and quoting—the language of Section 2.1(h) as well as 2.1(g): "The list of assets … included 'all of the intangible rights and properties of Seller used exclusively in the Business,'

---

[1] FFP frequently omits from its quote of Section 2.1(h) the crucial limiting provision: "*related exclusively* to the Business."  J.A. 385, 425 (emphasis added); FFP Brief at 10, 12, 15, 20, 22.

[quoting from §2.1(g)] *and 'all claims of Seller against third parties related exclusively to the Business'"* [quoting from §2.1(h)].  J.A. 806 (emphasis added). Then, in its analysis, the court explained why FFP's contention was wrong:

> FFP conflates the concepts of severability and exclusivity. The *Urethane* cases antitrust claims exist to compensate those customers cheated by the *Urethane* cases defendants for unlawfully fixing the prices of Foam Chemicals. Vitafoam purchased Foam Chemicals for four of its United States plants, High Point and Tupelo being two of them. Vitafoam owned only one antitrust claim. As such, this claim could not be "exclusive" to any of its individual foam manufacturing facilities.

J.A. 817.

The district court's analysis is correct.  Vitafoam's claim in the *Urethane* action is asserted in the original complaint filed by the Dickstein firm in October 2008,  J.A. 139-98,  and in the first and second amended complaints filed by that same firm in 2009, J.A. 200-60, 724-83.  As described below, the relevant provisions of those complaints demonstrate that Vitafoam's claim did not "relate exclusively" to the business of the High Point or Tupelo plants, but rather was a claim belonging to Vitafoam as a whole, encompassing all Vitafoam purchases, at prices inflated due to the suppliers' price fixing, for all of its U.S. urethane plants during the 1999-2003 claims period.

FFP's argument is, essentially, that because *some* of the *chemicals* Vitafoam purchased were used in the High Point and Tupelo facilities prior to the sale, Section 2.1(h) somehow applies.  But that fact does not mean that Vitafoam's price

fixing *claim* "related exclusively" to the High Point and Tupelo businesses, as required by Section 2.1(h). The *Urethane* claim in the complaints says nothing about the various locations of the plants where the urethane chemicals were used—indeed, they never mention High Point or Tupelo—because a price-fixing claim *has nothing to do* with the use of the product or location of such use. "To establish a Section 1 violation, a plaintiff must prove, and therefore plead, '(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade.'" *Loren Data Corp. v. GXS, Inc.*, 501 Fed. App'x 275, 279 (4th Cir. 2012) (quoting *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002)). The elements of a price fixing claim under Sherman Act Section 1 are "price increases implemented by Defendants" and "enough factual allegations, or 'plus factors' to plausibly suggest an agreement in violation of the Sherman Act." *Haley Paint Co. v. E.I. Dupont De Nemours & Co.*, 804 F. Supp. 2d 419, 425-26 (D. Md. 2011).

Paragraph 2 of the *Urethane* complaints asserts on behalf of both Vitafoam and FFP: "Plaintiffs paid artificially inflated prices for Polyether Polyol Products [i.e., urethane chemicals] that they purchased from Defendants and their co-conspirators." J.A. 143, 204, 728. In particular, the *Urethane* antitrust complaints state that Vitafoam, "a North Carolina corporation … purchased substantial quantities of Polyether Polyol Products in the United States from one or more Defendants or their co-conspirators during the damages period and was injured by

Defendants' antitrust violations alleged herein." J.A. 154 ¶ 40, 215 ¶ 39, 739 ¶ 39. Vitafoam's antitrust claim is entirely unaffected by where the chemicals were used –or, indeed, whether it used the price fixed chemicals at all. The *Urethane* complaints do not assert separate claims for purchases made at any individual plants. The complaints establish conclusively that Vitafoam asserted only *one* price-fixing claim, for *one* harm, seeking damages for all the urethane chemicals that Vitafoam purchased during the 1999-2003 claims period. (FFP, and the other plaintiffs, likewise asserted only one claim. J.A. 148 ¶ 20, 209 § 18, 733 ¶ 18.) All of the settlement proceeds at issue resulted from Vitafoam's one claim. The claim therefore could not have "related exclusively" to either or both of the Tupelo or High Point plants.

As the district court noted in its order, J.A. 817, FFP continues to conflate exclusivity and severability in its brief in this Court . *See* FFP Brief at 23-26. Contrary to FFP's contention, the district court did not hold that antitrust claims can never be severed as a matter of law–but rather that the *Urethane* claim was not "used exclusively" by, and did not "relate exclusively" to, the High Point and Tupelo plants and thus was not within the Purchased Assets under either Section 2.1(g) or (h) of the Agreements. J.A. 817-18 ("The antitrust claim is a chose in action arising from tortious conduct entirely unrelated to the day-to-day operations of either the High Point or Tupelo facilities. It arises from the unlawful actions of

the *Urethane* Defendants in fixing prices."). The district court simply addressed the contract at issue.[2]

FFP further asserts that, before the district court, Vitafoam "did not dispute that the High Point and Tupelo antitrust claims were 'claims … against third parties'" (FFP Brief at 16, citing J.A. 85-86)—which may create the impression that Vitafoam somehow acknowledged that it had multiple claims. The opposite is true. The quoted language is from Section 2.1(h) of the Agreements, not Vitafoam's brief. To the contrary, Vitafoam maintained that "Vitafoam's price fixing claim" (singular) is "for all the urethane chemicals purchased and paid for by Vitafoam on a corporate, companywide basis." J.A. 86.

FFP also argues that, under the *Illinois Brick* line of cases, "the High Point and Tupelo plants had separate causes of action against each supplier of price-fixed chemicals." FFP Brief at 32. But *Illinois Brick* provides no support for FFP's theory that the High Point and Tupelo plants, which have no independent corporate existence, somehow have standing to bring a claim apart from Vitafoam, the corporation that owned the assets making up those plants. This Court has

---

[2] For this reason, the cases cited and discussed at length by FFP for the proposition that antitrust claims can be severed in appropriate circumstances, *Novell, Inc. v. Microsoft Corp.*, 429 Fed. App'x 254, 260 (4th Cir. 2011), and *Morton's Mkt., Inc. v. Gustafson's Diary, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999), are irrelevant to this appeal. Even if severability were at issue, which it is not, none of the cases suggest that an antitrust claim alleging a single corporation purchased goods at a price inflated by price fixing can be severed according to the plants at which the purchased goods were used.

explained that the holding of *Illinois Brick* is that "where a series of direct and indirect purchasers claim injury as a result of a seller's misconduct, the direct purchasers are deemed to be the only persons injured in their business or property within the meaning of § 4, and indirect purchasers are not given a right to sue." *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 924 F.2d 539, 543 (4th Cir. 1991). FFP cites no authority for the proposition that an unincorporated collection of assets can own a claim. To the contrary, assets have no standing to pursue claims. The Clayton Act's provision on standing states that "any *person* who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor …." 15 U.S.C. § 15(a) (emphasis added). As this Court noted, under *Illinois Brick*, "direct purchasers are … the only *persons* injured." *Laurel Sand,* 924 F.2d at 543 (emphasis added). The Clayton Act specifies that "[t]he word 'person' or 'persons' wherever used in this Act shall be deemed to include *corporations* and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country." 15 U.S.C. § 12(a) (emphasis added). Facilities and other assets are not included. It is Vitafoam, the corporation, that made the purchases; it is Vitafoam that suffered the damages from price-fixing; and it is Vitafoam that has the standing to bring an antitrust claim.

Contrary to FFP's assertion, FFP Brief at 26, the parties' stipulation does not contradict this straightforward proposition of law. The Joint Stipulation makes plain, first, that the Dickstein firm representing both Vitafoam and FFP determined how to allocate the proceeds of each settlement to each *plaintiff*:

> 5.     The Dickstein Firm, in consultation with Bates White, LLC (the "Bates White Firm") as the experts retained by the Dickstein Firm on behalf of the plaintiffs to determine the damages sustained by each plaintiff as a result of the alleged antitrust violations by the named defendants, including Bayer, determined the proceeds of the Bayer settlement to be allocated to each plaintiff, including Vitafoam and FFP.

J.A. 49-50. There is no suggestion that any claim, or the settlement proceeds therefrom, belongs to the plants, rather than the corporate plaintiffs. The stipulation then makes clear that the Dickstein firm determined that settlement amounts attributable to Vitafoam's purchases used at the High Point and Tupelo plants were to be paid to Vitafoam, not FFP:

> 6.     In such determination and allocation, the amount of such settlement payment by Bayer that was allocated to and paid to Vitafoam on or around August 15, 2007, included those purchases of MDI, polyols and TDI (the urethane chemical materials subject to illegal price-fixing) determined by the Bates White Firm to be attributable to the High Point and Tupelo urethane plant facilities during the claims or damages period (then 1999-2004). None of the purchases of urethane chemical materials determined by the Bates White Firm to be attributable to the High Point and Tupelo urethane plant facilities were included in the determination and allocation of the amount of such settlement payment by Bayer allocated and paid to FFP.

15

J.A. 50.  The stipulation explains that the settlement payment allocated to Vitafoam include *both* amounts attributable to chemicals used at the High Point and Tupelo facilities and amounts attributable to chemicals used at Vitafoam's other facilities—providing further evidence that Vitafoam's claim did not "relate exclusively" to the High Point and Tupelo plants:

> 7.  The net settlement payment (net of Vitafoam's allocable share of fees and expenses) to Vitafoam in August, 2007, was $2,532,800.… The amount of the net payment made to Vitafoam from the Bayer settlement attributable to purchases of urethane chemical materials determined by the Bates White Firm to be attributable to the High Point and Tupelo urethane plant facilities was $1,301,495.

J.A. 50.  The stipulation thus demonstrates that Vitafoam's price fixing claim is not "related exclusively" to the High Point and Tupelo plants, as required by Section 2.1(h).

Nor does FFP's citation of Vitafoam's answer support its argument.  *See* FFP Brief at 26.  The answer says:

> 19.  …. It is admitted that the Vitafoam US facilities, including High Point and Tupelo, ordered urethane chemicals off of the Vitafoam centralized and company-wide corporate purchase contracts for delivery to, use at, and invoicing to that facility.

> 20.  Denied and all damages were sustained by Vitafoam on a company-wide corporate basis as a result of the price fixing was on account of purchases made by Vitafoam on a company-wide corporate basis and long prior to the Agreements and sale of assets thereunder, and none of any such damages were sustained by FFP.

J.A. 25. Vitafoam's answer thus expressly states that the chemicals were ordered based on "company-wide corporate purchase contracts," and the purchases were "made by Vitafoam on a company-wide corporate basis."

Finally, FFP seeks somehow to argue with reference to an earlier agreement for the sale of a Chattanooga facility. FFP Brief at 20. Having acknowledged that the Agreements are unambiguous, J.A. 329, FFP cannot employ extrinsic evidence to construe their terms. *Lattimore v. Fisher's Food Shoppe, Inc.*, 313 N.C. 467, 474, 329 S.E.2d 346, 350 (1985). FFP itself acknowledged before the district court that such evidence is inadmissible. J.A. 347, 799. At any rate, the earlier contract FFP cites provides no support for FFP's position: that the Chattanooga contract may have excluded all third party claims does not mean that the Agreements included all third party claims. As described above, the Agreements plainly do not assign all third party claims, but only those "exclusively related" to the High Point and Tupelo plants, and the earlier Chattanooga contract does nothing to suggest which claims are included and which excluded under the Agreements.

Because Vitafoam's claim is neither exclusively related to, nor used by, the High Point or Tupelo plants, neither Section 2.1(h) nor 2.1(g) of the Agreements applies. The district court therefore properly concluded that Vitafoam's *Urethane* claim falls within the excluded assets of Section 2.2(n), which specifies that "all intangible rights not used exclusively in the Business" are excluded from the sale

"(provided such rights and property are not material to the conduct of the Business as conducted immediately prior to the Closing)."  J.A. 385, 425.   Claims are intangible interests.  *In re Edmundson,* 273 N.C. 92, 95, 159 S.E.2d 509, 512 (1968) ("a chose in action" is "an intangible asset").

### B.   *The district court did not rely on any grounds not raised by the parties.*

As the previous discussion makes plain, FFP's assertion that the district court did not consider Section 2.1(h) of the Agreements, upon which FFP relies, is wrong.  See FFP Brief at 16.  The district court quoted the language of Section 2.1(h) on page 2 of its order, noting that the Agreements listed the assets transferred, including "all claims of Seller against third parties related exclusively to the Business."  J.A. 806.  Judge Reidinger did not, and was not required to, explicitly state that the quoted language came from Section 2.1(h), instead noting that the quoted language was part of the "list of assets" sold under the Agreements.  His analysis also explained why the language of Section 2.1(h) did not apply: because of its use of the term "exclusively:"

> Since the *Urethane* cases antitrust damages can be, and have been, allocated specifically to the High Point and Tupelo plants, FFP asserts these damages arise exclusively from those operations.  This is where FFP goes adrift.

> FFP conflates the concepts of severability and exclusivity.  The *Urethane* cases antitrust claims exist to compensate those customers cheated by the *Urethane* cases defendants for unlawfully fixing the prices of Foam Chemicals.  Vitafoam purchased Foam Chemicals for

18

> four of its United States plants, High Point and Tupelo being two of them. Vitafoam owned only one antitrust claim. As such, this claim could not be "exclusive"' to any of its individual foam manufacturing facilities.

J.A. 817. As signaled by the word "Moreover" following the quoted passage, the district court did go on to provide an additional reason that Section 2.1(g) in particular did not apply, explaining that "the antitrust claim was not 'used exclusively in the' High Point and Tupelo" facilities, as required by that subsection. *Id*. Nevertheless, the court's analysis regarding exclusivity applied equally to Section 2.1(h): since Vitafoam's claim "could not be 'exclusive' to any of its individual foam manufacturing facilities," it could not be "exclusively related" to any of them.

FFP's assertion that Vitafoam did not raise Section 2.2(n), which explicitly excludes "all intangible rights not used exclusively in the Business," in the district court (FFP Brief at 9) also is incorrect. Vitafoam explicitly cited and quoted Section 2.2(n) in its brief in support of its motion for summary judgment. J.A. 79; *see also* 84 (quoting 2.2(n)).

Moreover, even if the district court hadn't quoted Section 2.1(h) and explained explicitly why the section did not apply, there would be no Rule 56(f) violation. Rule 56(f) requires a court to give notice and time to respond only when the court grants "the motion on grounds not raised by a party." *JNV Aviation, L.L.C. v. Flight Options, L.L.C.*, 495 Fed. App'x. 525, 531-33 (5th Cir. 2012).

Here, both parties moved for summary judgment on whether Vitafoam conveyed its *Urethane* claim under, and therefore breached, the Agreements. Specifically, Vitafoam's motion requested summary judgment on the ground that "Vitafoam did not sell and transfer to FFP that portion of its price-fixing claim against chemicals suppliers related to Vitafoam's purchases during the 1999-2003 period of chemicals used at those two plants." J.A. 71. FFP similarly moved for summary judgment on "Count One of FFP's Complaint- Breach of Contract." J.A. 325. FFP contended that it owned Vitafoam's *Urethane* claim under the unambiguous language of the Agreements. *See, e.g.*, J.A. 681 ("As set forth in FFP's separate motion for summary judgment, the clear and unambiguous terms of the contracts between the parties assigned all of Vitafoam's claims against third parties related to chemicals used exclusively at Vitafoam's High Point, NC and Tupelo, MS polyurethane foam manufacturing facilities to FFP"). The district court ruled that "Vitafoam did not convey its antitrust claim to FFP pursuant to the Agreements" and awarded summary judgment on that ground—the same ground raised, and extensively briefed, by both parties.

Thus, there was no Rule 56(f) violation. *See THI of New Mexico at Valle Norte, LLC v. Harvey*, 527 Fed. App'x 665, 679-80 (10th Cir. 2013) (concluding that there was no Rule 56(f) violation where district court applied interpretation of a statute not advanced by the parties, explaining that "the ground that Valle Norte

20

advanced was that the attorney-deceit statute — properly construed — afforded it relief.  In turn, the district court interpreted the statute, and it ruled that the statute did not provide a basis for relief.  As such, the district court's determination was directly responsive to the ground for relief presented by Valle Norte."); *Liberty Mut. Ins. Co. v. Pella Corp.*, 650 F.3d 1161, 1178 (8th Cir. 2011) ("Although Liberty Mutual emphasized its "actual occurrence" and "other insurance" *arguments,* the critical *issue* necessarily encompassed whether Liberty Mutual had *any* reasonable basis for denying coverage…The district court did not grant summary judgment on an issue not raised by the parties because the ultimate *issue* never changed:  the undisputed record showed that Pella could not establish that Liberty Mutual had "no reasonable basis" for denying coverage." (emphasis in original)).

**C.** ***FFP's conversion claim is totally dependent upon and derivative of its contract claim, and fails as a matter of law.***

As the district court noted (J.A. 822), a claim is intangible, and cannot be the subject of a conversion claim.  *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 414, 537 S.E.2d 248, 264 (2000).  Furthermore, for the reasons stated in the district court opinion and set forth above, FFP has no contractual right under the Agreements to any portion of Vitafoam's *Urethane* claim.  An essential element of any conversion claim is the claimant's right to the property the subject of the alleged conversion.  *Variety Wholesalers, Inc. v. Salem Logistics Traffic*

*Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (citing "ownership in the plaintiff" as an "essential element [] of a conversion claim"). As Vitafoam argued below, because FFP has no contractual right to Vitafoam's *Urethane* claim or the proceeds of any settlements of Vitafoam's *Urethane* claim, it has no conversion claim based on those proceeds. J.A. 95. The district court agreed:

> Because the Court has ruled that ownership of the antitrust claim is vested in Vitafoam pursuant to the Agreements, FFP's conversion theory of liability against Defendants legally fails. FFP cannot satisfy the first element of the conversion cause of action, its rightful ownership of the antitrust claim.

J.A. 821. The district court thus correctly dismissed FFP's conversion claim, on grounds raised by Vitafoam.

### D. *FFP's claims are barred by the statute of limitations.*

#### 1. FFP's claims accrued more than three years prior to the filing of this action.

As the district court correctly recognized, under North Carolina law, "the statute of limitations for bringing a cause of action for breach of contract, conversion, or unjust enrichment is three years." *Housecalls Home Health Care, Inc. v. State Dep't of Health and Human Servs.,* 200 N.C. App. 66, 70, 682 S.E.2d 741, 744 (2009) (citing N.C. Gen. Stat. § 1–52(1), (4) (2007) and *Dean v. Mattox,* 250 N.C. 246, 251, 108 S.E.2d 541, 546 (1959)).[3] The cause of action accrues for

---

[3] FFP asserts that Vitafoam did not seek summary judgment that FFP's conversion claim was barred by the statute of limitations. FFP Brief at 21 n.2. That is wrong. Vitafoam's motion sought summary judgment on the grounds that "FFP's

breach of contract, and thus the statute of limitations begins to run, when the slightest invasion of a party's rights occurs. *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C.*, 180 N.C. App. 257, 262, 636 S.E.2d 835, 839 (2006) ("The accrual of the cause of action must therefore be reckoned from the time when the first injury was sustained. … When the right of the party is once violated, even in ever so small a degree, the injury, in the technical acceptance of that term, at once springs into existence and the cause of action is complete." (internal quotation omitted)).  The district court therefore correctly concluded that, "[h]ad Vitafoam conveyed those portions of the claim to FFP as an intangible asset pursuant to the Agreements, Vitafoam would have breached the Agreements the moment Vitafoam asserted any right to seek recovery from the *Urethane* cases defendants via a claim it no longer owned."  J.A. 824.

FFP seeks to interpret the district court's holding as a conclusion "that Vitafoam's assertion of any antitrust claim against any chemical supplier was the *one and only time* Vitafoam breached the Agreements."  FFP Brief at 27 (emphasis added).  The district court said no such thing, however.  The court only, and correctly, stated North Carolina law, which, as noted above, is that *any* breach, "even in ever so small a degree," starts the statute of limitations running.  As the

---

claims"—plural, without exception—"are barred by the statute of limitations."  J.A. 71. Vitafoam's brief likewise argued that the statute of limitations for conversion had run.  J.A. 89-91.

district court put it, "Vitafoam would have breached the Agreements the instant it sought damages based on its assertion of ownership of the antitrust claim." J.A. 824.

If FFP had any claim, that claim accrued upon Vitafoam's failure to assign the price-fixing claim to FFP at the December 2005 closing of the assets purchases, Vitafoam's submission of its June 9, 2006 opt-out notice listing all of its urethane facilities, including High Point and Tupelo, or, at the latest, in August 2007 upon Vitafoam's receipt of that portion of the Bayer settlement proceeds attributable to the purchase of chemicals used at the High Point and Tupelo plants during the 1999-2003 claims period—all of which Vitafoam asserted in its summary judgment briefs. Thus, the three-year period governing FFP's claim expired no later than August 2010. FFP filed this action May 22, 2012, almost two years too late.

The district court focused on the filing of Vitafoam's opt-out notice of June 9, 2006 as the date on which Vitafoam first asserted its ownership and control of its *Urethane* claim. FFP now asserts that the parties stipulated that the under that notice, Vitafoam "was *merely* opting out of the settlement;" that, in other words, the "notice was *simply* a request of 'opt-out or exclusion from the Bayer settlement in the then pending antitrust class action suit." FFP Brief at 30, 34

24

(emphasis added).  To the contrary, the Joint Stipulation contains no such limiting language.  The relevant paragraph states:

> 2.    In June 2006 Vitafoam and FFP, and other prospective plaintiffs in the later filed *Urethane* action, submitted notices of opt-out or exclusion from the Bayer settlement in the then pending antitrust class action suit, copies of which Notices by Vitafoam and FFP dated June 9, 2006, are attached hereto as Exhibit A, along with the suggested template provided by the Dickstein Firm to Vitafoam for purposes of its notice of opt-out.

J.A. 46.  The opt-out notice was the first step in asserting a claim against the members of the price-fixing conspiracy.  As the parties stipulated, the template that the Dickstein firm sent specifically says to "insert each entity … that purchased [urethane chemicals] during the time period 1/01/99-12/31/04, and that *possesses the rights to pursue claims for such purchases*."  J.A. 57 (emphasis added).  The Dickstein form then says to list the "business addresses … used by the above entities … in the ordinary course of their business, with respect to the purchases of products underlying this request for exclusion from the Settlement Class."  J.A. 57.  In its June 2006 notice, Vitafoam listed itself as an entity that possessed the right to pursue claims, with a list of addresses that included High Point and Tupelo as places Vitafoam used the chemicals.  J.A. 55.  Vitafoam's notice was thus an unequivocal assertion of ownership over the *Urethane* claim.  Conversely, FFP did not list High Point and Tupelo in its June 2006 opt-out notice.  J.A. 59.

FFP further argues on appeal that Vitafoam's asserting the antitrust claim at issue "would not cause FFP any harm and give rise to a breach of contract claim." FFP Brief at 30. However, FFP's own complaint forecloses this contention. FFP stated that "Ownership of the *Urethane* Claims therefore transferred to FFP pursuant to the Agreements upon the Closing Date on or about December 31, 2005." J.A. 15 ¶ 21. Accordingly, FFP alleged specifically that "Vitafoam's assertion of ownership over the *Urethane* Claims constitutes a breach" of the Agreements, in addition to alleging separately that "Vitafoam's acquisition and retention of proceeds relating to the Bayer Claims obtained in the Bayer Settlement, and its refusal to return those proceeds upon demand, are breaches." J.A. 18, ¶¶ 44, 45.

Even if Vitafoam's submission of its opt-out notice of June 6, 2006 was somehow not a breach by Vitafoam of the Agreements, Vitafoam's receipt and retention of money in settlements of its antitrust claim as against Bayer in July/August 2007, including amounts related to the purchase of chemicals used at High Point and Tupelo, certainly would constitute such a breach (assuming *arguendo* that FFP somehow had a valid contract claim). As noted above, FFP's complaint admits explicitly that "Vitafoam's acquisition and retention of proceeds relating to the Bayer Claims obtained in the Bayer Settlement, and its refusal to return those proceeds upon demand, are breaches." J.A. 18 ¶ 45.

26

FFP stipulated that Vitafoam received funds in the Bayer settlement in 2007, including funds attributable to chemicals used at High Point and Tupelo:

> The Dickstein Firm represented the plaintiffs, including Vitafoam and FFP, in the full settlement in July 2007 of their claims in the Urethane action as against the defendant Bayer AG ….
>
> [T]he amount of such settlement payment by Bayer that was allocated to and paid to Vitafoam on or around August 15, 2007, included those purchases of MDI, polyols and TDI (the urethane chemical materials subject to illegal price-fixing) determined by the Bates White Firm to be attributable to the High Point and Tupelo urethane plant facilities ….
>
> None of the purchases of urethane chemical materials determined by the Bates White Firm to be attributable to the High Point and Tupelo urethane plant facilities were included in the determination and allocation of the amount of such settlement payment by Bayer allocated and paid to FFP.

J.A. 48-49 ¶¶5-6.  FFP makes the same concession now.  FFP Brief at 31.  In other words, it is undisputed that, in August 2007, Vitafoam sought, received, and retained funds related to the purchase of chemicals used at Tupelo and High Point. Whatever the status of Vitafoam's previous acts to assert the claim that FFP now alleges it owns, Vitafoam's 2007 receipt and retention of disputed funds would have started the statute of limitations.

FFP makes several references to somehow being unaware that Vitafoam was asserting the right to recover damages for its purchases of chemicals used at the High Point and Tupelo facilities and receiving funds on that claim.  See, e.g. FFP Brief at 28 ("Vitafoam's undisclosed intent") and 33 ("unnoticed breach").

However, under North Carolina law, the statute of limitations begins to run without regard to when FFP became aware that Vitafoam was asserting a claim related in part to chemicals used at the High Point and Tupelo plants. In contract cases, the North Carolina Supreme Court has made clear that "a plaintiff's lack of knowledge concerning his claim does not postpone or suspend the running of the statute of limitations." *Pearce v. N.C. State Highway Patrol Voluntary Pledge Comm.*, 310 N.C. 445, 451, 312 S.E.2d 421, 425-26 (1984). Similarly, the discovery rule does not apply to "conversion and unjust enrichment claims." *Stratton v. Royal Bank of Canada*, 211 N.C. App. 78, 83, 712 S.E.2d 221, 227 (2011). Accordingly, the conversion "claim accrues, and thus the statute of limitations begins to run, when the unauthorized assumption and exercise of ownership occurs – not when the plaintiff discovers the conversion." *Id.*[4]

FFP now argues that Vitafoam's actions did not constitute an *anticipatory* breach. FFP Brief at 28. Applying the anticipatory breach cases arguably would allow FFP to circumvent the rule that lack of knowledge is irrelevant to the statute

---

[4] The effect of this rule is illustrated by the recent opinion of the North Carolina Court of Appeals in *Hardin v. York Mem'l Park*, 730 S.E.2d 768 (N.C. Ct. App. June 19, 2012), *rev. denied*, 366 N.C. 571, 738 S.E.2d 376 (2013). In *Hardin*, a woman had purchased a burial plot for her husband and an adjoining plot for herself in 1993. When she died 11 years later, her family first learned that the cemetery had re-sold the woman's plot in 1993, and it had been occupied since that time. The Court of Appeals affirmed, on statute of limitations grounds, the dismissal of a breach of contract claim arising out of the sale of the plot, holding that the discovery rule did not apply. *Id.* at 775-76.

of limitations for contracts. "The doctrine of anticipatory breach is well known: when a party to a contract *gives notice* that he will not honor the contract, the other party to the contract is no longer required to make a tender or otherwise perform under the contract because of the anticipatory breach of the first party." *Dixon v. Kinser*, 54 N.C.App. 94, 101, 282 S.E.2d 529, 534 (1981) (emphasis added). However, "the doctrine of anticipatory breach has in general no application to unilateral contracts, and particularly to such contracts for the payment of money." *Thomas v. Ocean Tech., Inc.*, 2009 WL 1578538 (E.D.N.C. May 29, 2009) (quoting *Smyth v. U.S.,* 302 U.S. 329, 356 (1937)) and citing *Phelps v. Herro,* 137 A.2d 159, 164 (Md.1957) ("pure and simple, where one party has fully performed his undertaking, and all that remains for the opposite party to do is to pay a certain sum of money at a certain time or times" the doctrine of anticipatory breach is not applicable)). FFP has stated that there is no "dispute that FFP fully performed its requirements under those Agreements," J.A. 705, thus conceding that the doctrine is inapplicable. Put simply, if the Agreements required Vitafoam to assign its price-fixing claim to FFP, then Vitafoam's assertion and prosecution of the claim, and receipt and retention of settlement funds on the claim constituted an actual, not anticipatory, breach.

## 2. The continuing wrong doctrine does not apply.

FFP's final contention is that the continuing wrong doctrine applies, arguing that while Vitafoam's assertion of its *Urethane* claim and its receipt of money from Bayer in settlement of its claim was more than three years prior to the filing of this action, FFP's claim to ownership of Vitafoam's *Urethane* claim remains timely with regard to Vitafoam's subsequent settlements against other *Urethane* defendants. FFP Brief at 32-36. FFP omits that North Carolina recognizes the continuing wrong doctrine only as "an exception to the general rule that a claim accrues when the right to maintain a suit arises." *Babb v. Graham,* 190 N.C. App. 463, 481, 660 S.E.2d 626, 637 (2008). Furthermore, "the extent to which Defendants engaged in 'distinct and separate' acts does not determine the applicability of the 'continuing wrong' doctrine." *Eubank v. Van-Riel*, 727 S.E.2d 25 (N.C. Ct. App. 2012) (unpublished).

"For the continuing wrong doctrine to apply, the plaintiff must show a continuing violation by the defendant that is occasioned by continual unlawful acts, not by continual ill effects from an original violation." *Birtha v. Stonemor, North Carolina*, *LLC*, 727 S.E.2d 1, 7 (N.C. Ct. App. 2012) (internal quotation omitted), *rev. denied*, 366 N.C. 570, 738 S.E.2d 373 (2013) "'Courts view continuing violations as falling into two narrow categories. One category arises when there has been a longstanding policy of discrimination. … In the second

30

continuing violation category, there is a continually recurring violation.' " *Id.* (quoting *Faulkenbury v. Teachers' & State Employees' Ret. Sys.,* 108 N.C. App. 357, 368, 424 S.E.2d 420, 425 (1993), *rev. denied*, 334 N.C 162, 432 S.E.2d 358 (1993)). FFP's claim fits neither category.

*Liptrap v. City of High Point*, 128 N.C. App. 353, 496 S.E.2d 817 (1998) is instructive. *Liptrap* dealt with a suit over the city's 1966 promise to make longevity payments to its workers, which payments were to have increased every five years. The payments were frozen in 1992, and plaintiff worker brought an action in 1996. The Court held the action barred by the two-year limitations period and that High Point's subsequent refusals to pay the increases did not amount to separate breaches of contract with their own limitations period. Rather, "[t]he effect of the subsequent refusals is only aggravation of the original injury." *Id.* at 356, 496 S.E.2d at 819. Similarly, Vitafoam's refusal to turn over to FFP a portion of the August 2007 Bayer settlement proceeds and the subsequent *Urethane* settlement payments is only an aggravation of the original alleged injury, caused by Vitafoam's assertion of sole ownership of the the *Urethane* claim, based on its correct determination that the claim belonged to Vitafoam, and not FFP.

FFP cites *Marzec v. Nye*, 203 N.C. App. 88, 690 S.E.2d 537 (2010) for the proposition that "the statute of limitations does not start running until the violative act ceases." FFP Brief 34. However, *Marzec* is a breach of fiduciary duty case,

not a breach of contract case, and as explained above, the rule in a breach of contract action is to the contrary. Indeed, the North Carolina Business Court has explained that the reasoning of fiduciary duty cases does not apply to a breach of contract when "a jury can affix the breach at a discrete point in time." *Blythe v. Bell*, 11 CVS 933, 2013 WL 440701 (N.C. Super. Feb. 4, 2013). Furthermore, the North Carolina Court of Appeals has emphasized that, in *Marzec*, the parties had a "continuing, albeit severely strained, business relationship, but at no point was the plaintiff's employment expressly terminated." *Stratton v. Royal Bank of Canada*, 211 N.C. App. 78, 86, 712 S.E.2d 221, 229 (2011) Here, as noted above, no later than August 2007, Vitafoam plainly sought and received antitrust settlement funds for chemicals purchased on a company-wide basis, including all chemicals used at High Point and Tupelo, and there was no ongoing relationship between the parties (much less a fiduciary relationship).

To argue the contrary, FFP cites an unpublished, pre-2007 Fourth Circuit case, *MedCap Corp. v. Betsy Johnson Health Care*, 16 Fed. App'x 180 (4th Cir. 2001) dealing with the U.C.C. FFP Brief at 33. In *MedCap*, as in *Marzec*, there was an ongoing relationship between the parties: the defendant hospital was making monthly installment payments for a SPECT nuclear medicine unit, but was alleged not always to have adhered to its exclusivity obligation, in which case its payments should have been higher. *Id.* at 183. Indeed, *Medcap* distinguishes

*Liptrap* on the ground of the ongoing relationship: "The Hospital continued to use the SPECT unit and make monthly installment payments." *Id.* at 184. Vitafoam has never paid FFP any funds attributable to chemicals used at Tupelo and High Point long prior to the FFP purchase—thus, *MedCap* and the continuing wrong exception do not apply.

The district court noted that "[i]n the contract action at bar, assuming FFP was the lawful owner of the *Urethane* cases antitrust claim, there was only one duty of performance, and thus, there could only be one such breach." J.A. 826-27. FFP does not assert, as it cannot, that the assignment of the *Urethane* claim (if any such claim was included in the Purchased Assets) was to occur at some future (i.e., post-closing) date, meaning that any such assignment had to occur as of the December 30, 2005 closing of FFP's purchase of the assets. *See, e.g.,* J.A. 14 (FFP Complaint ¶17 alleging that "[o]wnership of any and all claims against parties that Vitafoam previously held relating exclusively to the Businesses became the rightful property of FFP upon the Closing Date on or about December 31, 2005"). Accordingly, by FFP's own allegations, Vitafoam's exercise of ownership over the *Urethane* claim post-closing breached the contract and commenced the running of the statute of limitations.

## V.    CONCLUSION

The record shows that FFP got what it bargained and paid for—the operating assets of the High Point and Tupelo plants.  FFP now seeks what amounts to a windfall, based on FFP asserted right to subsequently discovered a *Urethane* claim that was neither (i) used or held for use in, nor an operating asset of, the High Point and Tupelo plants, nor (ii) "related exclusively" to those plants and thus not a Purchased Asset under the Agreements.  The district court's grant of summary judgment to Vitafoam should be affirmed.

This 20th day of February, 2014.

   /s/ A. Ward McKeithen
A. Ward McKeithen
N.C. Bar No. 5063
Everett J. Bowman
N.C. Bar No. 9132
Lawrence C. Moore, III
N.C. Bar No. 21731

ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246-1900
Telephone: (704) 377-2536
Facsimile:  (704) 378-4000
wmckeithen@rbh.com
ebowman@rbh.com
lmoore@rbh.com
Attorneys for Defendants-Appellees Vitafoam Incorporated and British Vita Unlimited

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all registered CM/ECF users.

 /s/ A. Ward McKeithen                        
A. Ward McKeithen
N.C. Bar No. 5063
Everett J. Bowman
N.C. Bar No. 9132
Lawrence C. Moore, III
N.C. Bar No. 21731

ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246-1900
Telephone: (704) 377-2536
Facsimile:  (704) 378-4000
wmckeithen@rbh.com
ebowman@rbh.com
lmoore@rbh.com
Attorneys for Defendants-Appellees Vitafoam
Incorporated and British Vita Unlimited

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 13-2449          **Caption:** Flexible Foam Products, Incorporated v. Vitafoam Incorporated and British Vita Unlimited

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

☑ this brief contains 8,388 words _____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐ this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☑ this brief has been prepared in a proportionally spaced typeface using Microsoft Office 2010 [*identify word processing program*] in 14-Point Times New Roman [*identify font size and type style*]; **or**

☐ this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) A. Ward McKeithen

Attorney for Defendants-Appellees Vitafoam Incorporated and British Vita Unlimited

Dated: February 20, 2014

04/13/2012
SCC

36